UNITED STATES, Appellee

v

RUFUS ZEIGLER, Jr., Private First Class,
U. S. Marine Corps, Appellant

20 USCMA 523, 43 CMR 363

No. 23,554

April 30, 1971

*Captain Michael J. Levin*, USMCR, argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Kenneth F. Ripple,* JAGC, USNR.

*Captain John J. Reilly,* USMCR, argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Charles J. Keever,* USMC, and *Commander Michael F. Fasanaro, Jr.,* JAGC, USN.

## Opinion of the Court

QUINN, Chief Judge:

This appeal brings up for review the correctness of a trial ruling admitting an Armed Forces Identification Card into evidence against the accused. Appellate defense counsel contend that the card was obtained from the accused in violation of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831, and should have been excluded.

Chief Warrant Officer Braxton encountered the accused at the service club at Camp Lejeune, North Carolina, during the early evening of August 13, 1969. The accused's disheveled clothing and unmilitary personal appearance led Braxton to ask the accused for his name and unit so that he could report the accused's condition to his unit. The next morning, Braxton telephoned the unit to which the accused had said he belonged, but learned that no one with the accused's name was assigned to it. Coincidentally, as Braxton was en route to his office in the guardhouse he again saw the accused. He stopped and asked the accused to "come" with him to the

guardhouse, which was "approximately one block away." Braxton explained the reason for his request as follows: He had "received word" from the area commander to check "any suspicious persons on the base" because of incidents of violence "throughout the country" and "a few . . . in this area." The accused's appearance and his furnishing "an erroneous organization the night before," led him to "suspect . . . [he] might not be in the military."

At the guardhouse, the accused insisted that his name was Robert Smith, and he claimed to be assigned to a unit at Camp Lejeune. He maintained that his Armed Forces Identification Card was in his wallet, which was in the possession of a friend at the Food Service School Company. Accompanied by an escort, he was allowed to leave the guardhouse "to retrieve his wallet." When the accused and his escort had left, Braxton telephoned the unit to which the accused, as Robert Smith, had claimed he was assigned. He was advised "there was no such" person as Robert Smith "in

their organization." Braxton "figured then" that the accused was "a civilian" who had come "aboard the base" for a disruptive purpose. He called Corporal Nigrelli, a "chaser" at the guardhouse, "described" the accused to him, and instructed Nigrelli to go to the Food Service School Company to apprehend the accused, and "bring him back" to the guardhouse.

Nigrelli went to the Food Service School Company, but he could not locate the accused. However, as he drove through the area he "spotted" the accused "walking on the road down there"; no one was with him. Nigrelli stopped his truck, approached the accused, and advised him he "was under military apprehension." He handcuffed the accused, placed him in the truck, and drove back to the guardhouse. In the time it took Nigrelli to get out and proceed to the rear of the truck, the accused had apparently gotten out. Nigrelli found him engaged in conversation with several Marines, and he appeared to be trying to give his wallet to one of them. Nigrelli informed the accused he "couldn't do" that because he "had to keep all his gear with him." He escorted the accused into the guardhouse. Inside, Nigrelli took the wallet from the accused, who had "carried" it with him, and removed the handcuffs, apparently to enable the accused to take "all of his gear out of his pockets." Then, Nigrelli again placed the handcuffs on the accused and escorted him to Warrant Officer Braxton. He gave the accused's wallet to Braxton. Braxton "looked in" it and saw an Armed Forces Identification Card bearing the accused's name. The card had no "picture on it" and was "not laminated." It became the subject of a charge of wrongful possession of an unauthorized identification card, in violation of Article 134, Code, supra, 10 USC § 934.

Although there is no explicit testimony on the subject, it may fairly be inferred from the evidence that Warrant Officer Braxton had law enforcement responsibility in regard to the security of the Government property and preservation of order in what is described in the record as the Montford Point area of Camp Lejeune. We can, therefore, properly judge the propriety of his actions from the standpoint of the "flexible responses" allowed an investigating officer in a "rapidly unfolding" situation. Terry v Ohio, 392 US 1, 10, 20 L Ed 2d 889, 88 S Ct 1868 (1968).

In Cafeteria Workers v McElroy, 367 US 886, 6 L Ed 2d 1230, 81 S Ct 1743 (1961), the Supreme Court of the United States recognized the right of the Government to deny civilians entry to important military installations. The right to prohibit entry necessarily includes the right to eject unauthorized persons found within the installation. We have no doubt, therefore, that it was entirely reasonable and lawful for Warrant Officer Braxton to request the accused, whom he had good cause to believe was a civilian, to accompany him to the guardhouse for further inquiry into his authority to remain on the base. Terry v Ohio, supra, 392 US 1, at page 22. Since the accused had lied to him the previous evening, Braxton could reasonably anticipate that he might need the communication facilities at the guardhouse to verify such information as he might receive from the accused regarding his right to remain on the base. True, Braxton was mistaken as to the accused's status, but the matters known to him justified the belief, and his detention of the accused for further identification was reasonable under the circumstances. See Hill v California, 401 US 797, 28 L Ed 2d 484, 91 S Ct — (1971). Thus, nothing in this aspect of the incident was illegal, and no shadow of taint was cast on the succeeding events. Cf. Davis v Mississippi, 394 US 721, 22 L Ed 2d 676, 89 S Ct 1394 (1969).

It is apparent that at the guardhouse, Braxton questioned the accused as to his identity. There is no indication that Braxton preliminarily informed the accused of any right to remain silent. Since the reason for the questioning was Braxton's belief that the accused

**525**

was a civilian not authorized to be on the base, the inquiry was not, in our opinion, the kind of interrogation into the commission of a criminal offense which requires threshold advice as to the right against self-incrimination and the right to counsel. See Miranda v Arizona, 384 US 436, 16 L Ed 2d 694, 86 S Ct 1602 (1966); United States v Tempia, 16 USCMA 629, 37 CMR 249 (1967). We perceive no illegality in the nature or scope of the inquiry. Cf. United States v Maglito, 20 USCMA 456, 43 CMR 296 (1971); United States v Mackiewicz, 401 F2d 219 (CA2d Cir) (1968), certiorari denied, 393 US 923, 21 L Ed 2d 258, 89 S Ct 253 (1968); Au Yi Lau v United States Immigration and Naturalization Service, — F2d — (CA DC Cir) (1971).

Similarly, we perceive no illegality in the imposition of physical restraint upon the accused when Braxton ascertained that the new information provided by the accused was also false. Confronted with two successive instances of false information, Braxton could, in our opinion, reasonably conclude that physical restraint of the accused was essential, until he could determine his true identity and the authority for his presence at Camp Lejeune. See *Au Yi Lau,* supra. The kind of restraint imposed was described as "military apprehension." We need not pause to examine the nature or the consequences of that kind of detention. Compare Article 7, Code, supra, 10 USC § 807, and Terry v Ohio, supra, 392 US, page 26. We are satisfied that the restraint imposed, including the use of handcuffs, constituted "a reasonable response to the situation facing" Braxton at the time. Hill v California, supra, at page 804. The same circumstances made it appropriate to examine the accused's wallet for evidence of his identity. We conclude, therefore, that there was no illegal conduct by Braxton in the discovery and seizure of the unauthorized identification card. It follows that the trial ruling admitting the card in evidence was proper.

The decision of the United States

**526**

Navy Court of Military Review is affirmed.

Judge DARDEN concurs.

FERGUSON, Judge (dissenting):

I dissent.

In a long series of cases, this Court has consistently held that when an accused is suspected of an offense a *statement,* within the meaning of Article 31, Uniform Code of Military Justice, 10 USC § 831, may not be obtained from him unless he is first advised of his right to silence under this section of the Code. United States v Taylor, 5 USCMA 178, 17 CMR 178 (1954); United States v Holmes, 6 USCMA 151, 19 CMR 277 (1955); United States v Nowling, 9 USCMA 100, 25 CMR 362 (1958); United States v Williams, 10 USCMA 578, 28 CMR 144 (1959); United States v Corson, 18 USCMA 34, 39 CMR 34 (1968); United States v Rehm, 19 USCMA 559, 42 CMR 161 (1970). In the case at bar, Chief Warrant Officer Braxton testified, in part:

". . . [A]fter he [the accused] was *apprehended* by myself and he didn't have an ID card, and he gave me an erroneous name and erroneous organization at division, I sent him down to Food Service Company to try to *get his identification.*" [Emphasis supplied.]

Braxton ordered a chaser (guard) to accompany the accused. When the accused returned with his wallet, the unauthorized identification card (specification 1, Charge II) was found therein. Braxton further testified that it was not until *after* he observed the card that he warned the accused in accordance with the provisions of Article 31, Code, supra. Under such circumstances, the admission into evidence of the identification card was error materially prejudicial to the substantial rights of the appellant. United States v Nowling; United States v Corson; United States v Rehm, all supra.

I would reverse the accused's conviction for the unlawful possession of an unauthorized identification card

and order Charge II and its specification dismissed. I would return the record of trial to the Judge Advocate General of the Navy and direct that the Court of Military Review may reassess the sentence on the basis of the remaining offense of absence without leave.